AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>A single family house located at 11566 Dahlia Street, Thornton, Colorado<br>80233 (hereinafter "SUBJECT RESIDENCE"), more fully described in<br>Attachment A. | )<br>)<br>)<br>)<br>)<br>) |

Case No.   18-SW-5662-MEH

## APPLICATION FOR A SEARCH WARRANT

I am a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A attached hereto and hereby incorporated by reference.

located in the _____ State and _____ District of _____ Colorado _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B attached hereto
and hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 2, 371, 1343, 1349,<br>1956(a)(1), 1956(h) | Laundering of monetary instruments; Wire Fraud; Conspiracy; Aiding and Abetting |

The application is based on these facts:

See Affidavit attached hereto and hereby incorporated by reference.

☑ Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
s/ Justin Stern
*Applicant's signature*

Justin Stern, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.

☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   **02 Jul 2018**

_____
*Judge's signature*

City and state:   Denver, CO

Hon. Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

PREMISES TO BE SEARCHED

The SUBJECT RESIDENCE is a single family home located at 11566 Dahlia Street, Thornton, Colorado 80233. The home is located on the east side of Dahlia Street. The front door and garage face west. The home is the third home south of the intersection of East 116th Drive and Dahlia Street. The house number is displayed vertically in black on a timber just south of the front door. The home is two stories and has an attached three car garage north of the front door. The exterior of the garage is composed of grayish brick. The exterior of the home has grey-blue siding. A tree is present in the front of the house in the south lawn. The home is shown in the following photograph:



## **ATTACHMENT B**

ITEMS TO BE SEIZED

All evidence, fruits and instrumentalities relating to laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and wire fraud, in violation of 18 U.S.C. § 1343, to include:

1. Gift cards.
2. Gift cards packaging.
3. Receipts for gift cards.
4. Handbags that are darkly colored and/or have tan/brown straps.
5. Cellular telephones.
6. Shopping bags from retail merchants, including Walmart, Best Buy and Target.
7. Items that indicate residency, dominion and establish the identity(s) of individuals and entities that may control the Subject Residence to include identifying documents/cards; drivers licenses; passports; papers; documents; effects; keys; mail; bills; photographs; notes; letters; receipts; insurance policies; address and telephone records; government notices; registrations; titles and other records.
8. Safes; lock boxes; securable filing cabinets; locking storage containers or apparatus; including keys, combinations or other means required to open, examine and seize such items.
9. Records, ledgers, documents, notes, correspondence or other items relating to the redemption, purchase or sale of gift cards.
10. United States currency, checks, money orders, cashier's checks, negotiable financial instruments or other forms of payment or records thereof.
11. Financial records to include bank records, money order receipts, automatic teller machine receipts, wire transfers or other records.

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANTS

I, Justin Stern, Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, deposes and states under penalty of perjury that the following is true to the best of my information, knowledge and belief.

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for search warrants for the following:

a.      A single family house located at 11566 Dahlia Street, Thornton, Colorado 80233 (hereinafter "SUBJECT RESIDENCE").  The SUBJECT RESIDENCE is described herein and in Attachment A, with items to be seized described in Attachment B.

b.      A cellular telephone whose assigned telephone number is 720-822-4667 and International Mobile Equipment Identity is 359168072167760 ("SUBJECT CELL PHONE").  The SUBJECT CELL PHONE is described herein and in Attachment C, with items to be seized described herein and in Attachment D.

2.      I have been a Special Agent with the FBI since December of 2004.  I am the primary Case Agent for this investigation.  As the primary Case Agent, I am familiar with the facts of the case.  As a part of my training, I received seventeen weeks of investigative training at the FBI Academy in Quantico, Virginia.  Since completing training, I have participated in numerous criminal investigations.  These investigations have utilized physical and electronic surveillance, financial analysis, interviews, surreptitious recordings, undercover operations, search warrants, arrests, utilization of informants, seizure and analysis of computer information and various other techniques.  I am currently assigned to the Denver Division, responsible for investigating white collar crime and money laundering.  During my career with the FBI, I have

1

investigated organized crime, drugs, gangs, violent crime, firearms and money laundering for approximately ten years.

3.      The facts provided herein relate to the ongoing investigation of individuals involved in laundering the proceeds of fraudulent schemes via gift cards.  Specifically, the unidentified fraudsters induce victims to purchase and transfer large quantities of branded gift cards in a variety of states.  The branded gift cards are issued by retailers which have included Best Buy, Target and Walmart.  Launderers use the branded gift cards victims have purchased to conduct in-store purchases of other brands of gift cards at retail stores.  Launderers conduct these secondary, in-store purchases of gift cards within approximately twenty-four hours of victims' initial gift card purchases.  The eventual disposition of terminally purchased gift cards is presently unknown.  The net effect of this process is the successful laundering of fraudulent schemes using gift cards as currency.  I submit that there is probable cause to believe that this conduct constitutes money laundering, in violation of 18 U.S.C. §§ 1956(a)(1), wire fraud, in violation of 18 U.S.C. § 1343, and conspiracies to commit these crimes or aid and abet them, in violation of 18 U.S.C. §§ 2, 371, 1349, and 1956(h) (hereinafter "SUBJECT OFFENSES").

4.      My training and experience investigating white collar crime and money laundering offenses, including the SUBJECT OFFENSES, has demonstrated that individuals involved in these offenses often keep and maintain at their residence certain records used to profit, facilitate, conceal, and otherwise further them.  These records include personal financial records, such as records related to their bank accounts and credit cards.  It is also common for individuals to maintain at their residence records of their personal income, including income obtained via criminal activity.  These records can include payment logs, agreements, and communications relating to promises of payment.  Individuals involved in money laundering

may also keep records of the transactions used to conceal the proceeds of underlying criminal activity, including receipts.  Individuals involved in these crimes may also keep notebooks, business cards, or other records of the phone numbers and names of the individuals with whom they are working to conceal ill-gotten proceeds and to distribute those proceeds.  In order to keep documents describing criminal activity concealed it is common for them to be stored in safes, lock boxes or other secured containers.

5.       I further submit that XIAOLING DENG ("DENG"), also known as WENDY DENG, participates in the money laundering and wire fraud scheme via DENG's in-person redemption and repurchase of gift cards in Colorado.  I also submit DENG resides at the SUBJECT RESIDENCE and uses the SUBJECT CELL PHONE.

6.       The facts set forth in this affidavit are based on my personal knowledge as the investigation's Case Agent; knowledge obtained from other individuals including law enforcement personnel, my review of documents, reports and other evidence.  Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.  The information contained within this affidavit does not represent every fact learned by law enforcement during the course of the investigation.  Rather, I have only included information sufficient to establish probable cause for the requested search warrant.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

7.       Based on my training and experience, I know that a cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land

line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices.  A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices.  A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords.  Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.

8.     Cellular telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet.  They may also include GPS technology for determining the location of the device.  Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data.  Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing

documents, spreadsheets, and presentations.  Some cellular telephones also operate as a "tablet,"

or mobile computer, and can contain software programs called applications.  Those programs can

perform different functions and save data associated with those functions, including use

associated with the Internet.  Some cellular telephones also contain digital cameras and software

related to the taking of digital photographs.  Smartphones thus may contain in one device the

functions of the following devices:

      a.      GPS Navigation devices.  A GPS navigation device uses the

Global Positioning System to display its current location.  It often contains records of the

locations where it has been.  Some GPS navigation devices can give a user driving or walking

directions to another location.  These devices can contain records of the addresses or locations

involved in such navigation.  The Global Positioning System consists of 24 NAVSTAR satellites

orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly

transmits by radio a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that are publicly

available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can mathematically

calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      b.      Personal Digital Assistants.  A personal digital assistant, or PDA,

is a handheld electronic device used for storing data (such as names, addresses, appointments or

notes) and utilizing computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a

memory card or other removable storage media for storing data and a keyboard and/or touch

screen for entering data.  Removable storage media include various types of flash memory cards

or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

c.      Tablets.  A tablet is a mobile computer — typically larger than a phone yet smaller than a notebook — that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

d.      A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to permanently store data instead of using rotating platters.

e.      Portable Media Players.  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

f.      Routers and Modems.  Computer routers and modems are also used as instrumentalities of crimes.  Modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet, and some have separate digital storage capacity that allow them to connect to other devices and to store information similar to an external digital storage device like a flash card or thumb drive.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device or the computers and devices connected to it.

g.      Digital Cameras.  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable digital storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media includes various types of flash memory cards and miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos such as texts, word processing documents, or web pages.  If the camera is equipped with GPS technology, that information may be recorded as metadata associated with the photographs and videos taken with that camera as well as other information such as the make and model of the camera and the date and time the image was created.  Some cameras and removable storage media are now equipped with wireless capabilities, which allow for images and files to be uploaded from the camera or digital storage media directly to the Internet or to other digital storage devices or computers using a wired or wireless connection.

9.      "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

10.      Many modern cellular telephone have a touch ID sensor, a round button on device that can recognize fingerprints.  The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require.   It is common for cellular telephones with a touch ID feature to only permit a limited number of attempts with a fingerprint before the device will require the user to enter a passcode.   Furthermore, some devices (such as Apple iPhones) come equipped with an operating system that will not substitute for the use of a passcode or password if more than a certain number of hours (down to only 8 hours in very recent versions).  Similarly, touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful.  For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to any touch-ID equipped devices found at the SUBJECT RESIDENCE while executing the search warrant.  The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the Touch ID button.  Although I do not know which of the ten finger or fingers are authorized to

access on any given device and only a limited number of attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

11.     Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint.  Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

12.     Due to the foregoing, I am informing the court that law enforcement intends to press the fingers (including thumbs) of XIAOLING DENG, also known as WENDY DENG, to the Touch ID sensor or other device fingerprint sensor of the seized device, to the extent a visual inspection of those devices reveals that the device has a fingerprint sensor— located pursuant to the warrants requested by this Affidavit for the purpose of attempting to unlock the device via Touch ID or other fingerprint sensor in order to search the contents (including applications) as authorized by this warrant.

13.     Based on my knowledge, training, and experience, I know that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensic tools.

14.     Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

15.     There is probable cause to believe that things that were once stored on the

SUBJECT CELL PHONE may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that

digital files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

downloaded to a storage medium can be stored for years at little or no cost.  Even when files

have been deleted, they can be recovered months or years later using forensic tools.  This is so

because when a person "deletes" a file on a digital storage device or computer, the data

contained in the file does not actually disappear; rather, that data remains on the storage medium

until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in

free space or slack space—that is, in space on the storage medium that is not currently being

used by an active file—for long periods of time before they are overwritten.  In addition, a

computer's operating system may also keep a record of deleted data in a "swap" or "recovery"

file.

c.     Wholly apart from user-generated files, computer storage media

including digital storage devices and computers' internal hard drives can contain electronic

evidence of how a computer has been used, what it has been used for, and who has used it.  To

give a few examples, this forensic evidence can take the form of operating system

configurations, artifacts from operating system or application operation, file system data

structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or

delete this evidence, because special software is typically required for that task.  However, it is

technically possible to delete this information.

10

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

16.      *Forensic evidence*.  As further described in Attachment D, this application seeks permission to locate not only electronically stored information on the SUBJECT CELL PHONE that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT CELL PHONE was used, the purpose of the use, who used the SUBJECT CELL PHONE, and when the SUBJECT CELL PHONE was used.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT CELL PHONE because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.      I know that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to

commit the SUBJECT OFFENSES may contain: calls, voicemails, and text messages between individuals involved in fraud and money laundering and individuals attempting to commit those crimes; GPS searches and information associated with traveling in order to make financial transactions related to the scheme; internet searches pertaining to websites used to host fraudulently obtained credit cards or used to facilitate the purchase of gift cards; photographs and/or videos exchanged individuals involved in fraud and money laundering and individuals attempting to commit those crimes; social media apps such as Facebook or Instagram, where the phone owner may be communicating with individuals involved in fraud and money laundering and individuals attempting to commit those crimes; email accounts with emails containing communications related to fraud and money laundering.   Additionally, devices are often used to call, text, send photos and email information to criminal associates before, during, and after crimes to assist in the crimes both in planning, executing, and fleeing from the crime scene, and that information is likely contained in the memory of the cell phone.   In addition, people who use money launderers to launder the proceeds of other crimes are likely to communicate using texts, email, or by phone to arrange for the financial transactions that will be made to conceal the proceeds of crimes.

g.      I also know that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

h.      The size of the electronic storage media (commonly referred to as a hard drive) used in smartphones has grown tremendously within the last several years.  Phones containing hard drives with a capacity of 32 gigabytes are not uncommon.  These drives can

store thousands of images and videos at very high resolution.  Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country.  Once this is done, there is no readily apparent evidence at the "scene of the crime".  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

17.     *Need to review evidence over time and to maintain entirety of evidence*.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment D in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its

14

complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment D.  In order to obtain the full picture and meaning of the data from the information sought in Attachments C and D of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

18.     *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the SUBJECT CELL PHONE consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the SUBJECT CELL PHONE or information from a copy of the SUBJECT CELL PHONE consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the

SUBJECT CELL PHONE to human inspection in order to determine whether it is evidence

described by the warrant.

## THERE IS PROBABLE CAUSE TO BELIEVE THAT DENG IS LAUNDERING THE PROCEEDS OF A WIRE FRAUD SCHEME

**I.** **Surveillance Operations Show That DENG Has Personally Purchased and Attempted to Purchase Thousands of Dollars of Gift Cards Using Credit Cards Obtained by Cyberscammers**

19.     In January 2018, Thornton Police Department ("TPD") Detective Ty

Deichert initiated an investigation of DENG upon receiving information from an investigator

employed by Walmart.  The investigator identified DENG as a possible perpetrator of fraudulent

activity.  Walmart investigators' review of transactional records and store surveillance camera

footage associated DENG with hundreds of thousands of dollars of other-branded gift card

purchases via the redemption of Walmart gift cards of suspicious origins.

A.     DENG's Purchase of $7,000 of Walmart Gift Cards on February 15, 2018

20.     On February 15, 2018, TPD investigators conducted a physical

surveillance operation of DENG.  I have reviewed their report of that operation.  At

approximately 4:35 p.m. [1] Detective Ed Moran observed DENG enter a Walmart store located at

4651 West 121st Avenue, Broomfield, Colorado 80020.  Thereafter, Officer Michael Couture

observed DENG use a cellular telephone to purchase multiple gift cards at a self-checkout

terminal.  At approximately 4:45 p.m., Detective Moran observed Deng exit the Walmart store

and enter DENG's vehicle, a Honda sedan bearing Colorado license plate 143VQZ.  Inside of the

---

[1] All times in this affidavit are in the Mountain Time Zone, unless otherwise noted.  Times before March 11, 2018 are in Mountain Standard Time; times after March 11, 2018 are in Mountain Daylight Time.

car, Detectives Deichert and Moran observed DENG use and manipulate a cellular telephone.  At

approximately 5:15 p.m., Detectives Deichert and Moran observed DENG get out of her car and

walk back towards the Walmart store.  Inside of the store, Detective Fred Longobricco observed

DENG frequently using a cellular telephone.  Detective Longobricco also saw her conduct two

separate purchases of gift cards.  Detective Longobricco later conducted follow-up investigation

with Walmart and determined Deng purchased approximately $7,000 of gift cards there during

TPD's surveillance operation.

   **B.**  <u>DENG's Attempt to Purchase Best Buy Gift Cards on February 22, 2018</u>

   21.  On February 22, 2018, the Northglenn (Colorado) Police Department

("NPD") investigated DENG's suspicious activity at a Best Buy store located at 104 West 104th

Avenue, Northglenn, Colorado 80234.  I have reviewed NPD's reports of the incident, authored

by Officer Jordan Gillette.  The report states Officer Gillette responded to the Best Buy at

approximately 8:00 p.m.  Best Buy notified NPD that a woman, later determined to be DENG,

was attempting to use electronic gift cards purchased the same day to purchase new gift cards.

   22.  Upon arrival at Best Buy, Officer Gillette spoke to BEST BUY

MANAGER, whose identity is known to me.  BEST BUY MANAGER told Officer Gillette that

DENG had attempted to use an electronic gift card to purchase new gift cards valued at $3,500.

BEST BUY MANAGER investigated the origin of the electronic gift cards.  BEST BUY

MANAGER determined the electronic gift cards originated from three gift cards purchased on

February 22, 2018 in Delaware, North Carolina and South Carolina.  BEST BUY MANAGER

was able to identify two individuals who purchased the original gift cards.  One of those

individuals was VICTIM 1, whose identity is known to me.

23.     BEST BUY MANAGER identified and contacted VICTIM 1 who told BEST BUY MANAGER that VICTIM 1 purchased three gift cards in the amount of $2,000 each.  VICTIM 1 purchased the gift cards because a "pop-up" had occurred on VICTIM 1's computer and VICTIM 1 had been told by unspecified individuals that VICTIM 1 had to purchase the gift cards in order to repair the computer.

24.     Officer Gillette interviewed DENG, who told Officer Gillette that DENG received the electronic gift cards from unspecified friends in China.  These friends requested DENG purchase new gift cards for them because they were unable to use the electronic gift cards for international purchases.

25.     On June 6, 2018, I interviewed VICTIM 1.  Among other things, VICTIM 1 confirmed VICTIM 1 was the victim of a computer-based fraudulent scheme in North Carolina.  VICTIM 1 was led to believe that $6,000 had been inadvertently deposited into VICTIM 1's bank account.  The fraudster convinced VICTIM 1 to refund the supposed, inadvertent deposit, by purchasing three Best Buy branded gift cards using cash, $2,000 each, totaling $6,000.  VICTIM 1 was also induced to purchase two Walmart branded gift cards, $1,000 each, totaling $2,000.  VICTIM 1 provided the Best Buy gift cards to an unknown male fraudster via a cellular telephone call.  VICTIM 1 first realized VICTIM 1 had been defrauded when VICTIM 1 received the telephone call from BEST BUY MANAGER.

26.     On June 7, 2018, I interviewed BEST BUY MANAGER.  According to BEST BUY MANAGER, DENG possessed a cellular telephone during DENG's redemption and attempted purchase of gift cards at Best Buy.  BEST BUY MANAGER also recalled DENG's electronic Best Buy gift cards were maintained on DENG's cellular telephone and that DENG attempted to purchase other gift cards using the cellular telephone.

18

C.    DENG's Purchase of $6,000 of Walmart Gift Cards on June 19, 2018

27.    On June 19, 2018, an FBI surveillance camera was established with a vantage of the exterior area of the front of the SUBJECT RESIDENCE.  My review of footage from that day shows that at approximately 4:03 p.m., two individuals exited the SUBJECT RESIDENCE and entered a white Honda sedan.  One individual wore blue jeans/pants and a dark colored top.  The individual wearing blue jeans/pants and a dark colored top placed a small child in the back seat of the white Honda sedan, before sitting in the front passenger seat. Thereafter, the other individual drove the vehicle away.

28.    At the same time on June 19, 2018, I and other law enforcement personnel were conducting physical surveillance at the SUBJECT RESIDENCE.  At approximately 1:20 p.m., Detective Deichert observed DENG wearing a red dress in front of the SUBJECT RESIDENCE.  At approximately 1:30 p.m., I observed Clabaugh and DENG in front of the SUBJECT RESIDENCE.  I observed DENG and also personally saw her wearing a red dress.  I also observed a white Honda sedan parked in the garage with the garage door open.  United States Department of Homeland Security Investigations Special Agent Trevor Helderop observed Clabaugh enter the white Honda sedan and drive it away at the previous, approximate time noted.  Agent Helderop did not observe DENG or the child enter the vehicle.  Minutes later, I observed the white Honda sedan exiting the neighborhood, traveling eastbound on 115th Avenue. None of the participating law enforcement personnel were able to observe DENG in the white Honda sedan.

29.    On June 15, 2018, United States Magistrate Judge Kristen Mix authorized a prospective pen register/trap and trace with cell site location information for the SUBJECT CELL PHONE.  I have reviewed records from the pen register/trap and trace for the SUBJECT

CELL PHONE for June 19, 2018.  The records show that on June 19, 2018, at approximately 5:49 p.m., the SUBJECT CELL PHONE placed an outgoing telephone call to telephone number 304-261-5983.  The call accessed a cellular telephone tower in the approximate location of the intersection of South Parker Road and Twenty Mile Road.  I have used the Google Earth application[2] to measure the distance between this location and the nearest Walmart store.  The Walmart store located at 11101 South Parker Road, Parker, Colorado 80134 is approximately 0.3 miles from this location.

30.     Additionally, my review of the FBI surveillance camera footage from the evening hours of June 19, 2018, showed that at approximately 10:06 p.m., a white Honda sedan pulled into the driveway of the SUBJECT RESIDENCE.  Thereafter, an individual exited the front passenger seat holding bags.  Thereafter, the individual handed the bags to the driver, who had also exited the vehicle.  The individual then retrieved a small child from the backseat of the vehicle.  The individual carrying the child and driver entered the SUBJECT RESIDENCE via the garage.

31.     On June 20, 2018, a Walmart analyst sent me transactional information for the purchase of approximately $6,000 of gift cards conducted by an individual believed to be DENG at the store located at 11101 South Parker Road on June 19, 2018.  Since then I have also received and reviewed Walmart's video surveillance footage corresponding to DENG's transactions.  The transactions began at approximately 5:09 p.m. and concluded at approximately 5:41 p.m.  The brands of the purchased gift cards included Google, Steam, iTunes and Nintendo.

---

[2] Google Earth is a computer program that allows users to pull up a bird's eye view of any place in the world. It displays satellite images taken from far above the earth's surface with high-resolution cameras. Google Earth superimposes certain markers and labels onto the images, such as names of towns and locations of borders.

Seven different Walmart gift cards were used to purchase the other brands of gift cards.  These seven Walmart gift cards had account numbers ending in four digits: x9994, x8264, x6861, x5121, x8392, x4993 and x2782.  Four of these Walmart gift cards, x9994, x8264, x6861 and x5121 were purchased on the same day from approximately 4:59 p.m. – 5:00 p.m. at a Walmart store located at 9165 Cahill Avenue, Inver Grove Heights, Minnesota, 55076.  The records showed an individual used credit card account number x1300 to purchase the four Walmart gift cards in Inver Grove Heights.

32.     Thereafter, I conducted a financial investigation of account number x1300. I determined the card was a Visa credit card issued by Wells Fargo Bank.  One of the cardholders was VICTIM 2, whose identity is known to me.  On June 27, 2018, I interviewed VICTIM 2. Among other things, VICTIM 2 told me VICTIM 2 was the victim of a fraudulent scheme on June 18, 2018 and June 19, 2018.  VICTIM 2 initially received a telephone call from an individual known as John Matthews, who claimed to be a representative of the Comcast cable company.  Matthews duped VICTIM 2 into believing VICTIM 2's home computer had been hacked and required repair.  Matthews induced VICTIM 2 to provide payment to Matthews for the supposed repair by VICTIM 2's purchase and provision of more than approximately $12,000 in a variety of gift cards, to include four Walmart gift cards.  VICTIM 2 paid for the gift cards using VICTIM 2's Visa credit card, which had an account number ending x1300.  VICTIM 2 confirmed VICTIM 2 purchased the Walmart gift cards at the store located at 9165 Cahill Avenue.

33.     I have reviewed Walmart's video surveillance footage associated with DENG's use of VICTIM 2's Walmart gift cards to purchase $6,000 of other branded gift cards on June 19, 2018 at the Walmart store located at 11101 South Parker Road.  I have also

previously reviewed DENG's photograph maintained as part of DENG's Colorado driver's license dossier, number 081851092.  I can identify DENG as the individual in the store purchasing the gift cards.  DENG is wearing blue jeans/pants and a dark colored top. Additionally, the footage shows DENG carrying a dark colored handbag with tan/brown straps. In four separate instances, occurring between approximately 5:13 p.m. and 5:43 p.m., the footage shows DENG at self-checkout registers purchasing several gift cards by accessing a cellular telephone and utilizing a bar code scanner to pay for the purchased gift cards by scanning something on DENG's cellular telephone.  The footage shows DENG placing the purchased gift cards in plastic bags and retrieving paper receipts before DENG departs the checkout areas. DENG appeared to exit the store at approximately 5:26 p.m. and return to make additional gift card purchases at approximately 5:38 p.m.  DENG exited the store at approximately 5:44 p.m. and departed by accessing the front passenger side of a white sedan and driving away.

### THERE IS PROBABLE CAUSE TO BELIEVE THAT DENG USES THE SUBJECT RESIDENCE TO ORGANIZE AND PROCESS THE GIFT CARDS USED TO LAUNDER FRAUD MONEY

### I.   Tens of Thousands of Dollars of Gift Card Packaging Has Been Recovered from the SUBJECT RESIDENCE's garbage

34.   On February 6, 2018, TPD Detectives Brian Bennett and Scott Spurr recovered discarded trash from the SUBJECT RESIDENCE.  I have reviewed a copy of Detective Bennett's report and photographs of their recovery of the discarded trash.  I have also received an investigative summary prepared by Detective Deichert.  These documents show that Detectives Bennett and Spurr recovered approximately $27,700 of Apple iTunes and Google Play branded gift card packaging from DENG's trash.  The detectives also found multiple mailing envelopes addressed to DENG at the SUBJECT RESIDENCE.

35.     On February 13, 2018, TPD Detectives Deichert, Fred Dudley and Bryan Adair again recovered discarded trash from the SUBJECT RESIDENCE.  I have reviewed a copy of Detective Deichert's statement regarding the recovered discarded trash and TPD's photographs of the recovered trash.  Those records show that, among other things, the detectives recovered several bags of gift card packaging as well as shredded gift cards and receipts. Thereafter, TPD investigators pieced together several shredded gift cards identifying the brands as Apple, Steam, Nintendo, Google and Sony.

36.     On June 26, 2018, Detective Deichert and I examined and recovered discarded trash from the SUBJECT RESIDENCE.  Among other things, I recovered $5,100 in discarded gift card packaging contained within a plastic Walmart bag.  Specifically, I recovered packaging from forty-six Google Play gift cards having a face value of $100 each and six Apple App Store & iTunes gift cards having a face value of $100 each.  Detective Deichert and I also located and photographed various documents and mailing packaging bearing DENG's name and addressed to the SUBJECT RESIDENCE.  Detective Deichert and I located items addressed to or bearing the names of just two other individuals: Eric Clabaugh and Lan Shi.  Detective Deichert and I located multiple items of discarded mail addressed to Clabaugh at the SUBJECT RESIDENCE.  Multiple Amazon boxes were also identified that were addressed to Shi at a different address than the SUBJECT RESIDENCE in Littleton, Colorado.  Detective Deichert and I did not locate any items addressed to Shi at the SUBJECT RESIDENCE.

## II.  There is Probable Cause to Believe DENG Lives at the SUBJECT RESIDENCE

37.     I have obtained additional evidence supporting the conclusion DENG lives at the SUBJECT RESIDENCE.  Records from the Adams County (Colorado) Assessor's database show that DENG and Clabaugh sold a different property for $395,000 on August 16,

2017 and that Clabaugh bought the SUBJECT RESIDENCE a few weeks prior, on July 5, 2017 for $435,000.   Records from the Colorado Department of Motor Vehicles database show that a white 2014 Honda sedan bearing license plate 143VQZ is currently registered to DENG at the SUBJECT RESIDENCE.   Clabaugh's Colorado driver's license, number 132210467, issued on February 14, 2018, identifies Clabaugh's address as the SUBJECT RESIDENCE.   Other motor vehicle records show that a black 2015 Honda sedan bearing license plate QDY867 is currently registered to Clabaugh at the SUBJECT RESIDENCE.

38.    On March 7, Detective Deichert physically observed DENG and Clabaugh together in Denver at the scene of a traffic accident involving Deng's sister.   This information with the aforementioned property records; vehicle records; licenses; recovered items of evidence from the same trash addressed to/bearing Clabaugh's and Deng's names leads me to believe that Clabaugh lives with DENG and that they have some sort of personal relationship.

**THERE IS PROBABLE CAUSE TO BELIEVE THAT DENG USES THE SUBJECT CELL PHONE TO FACILITATE MONEY LAUNDERING AND MAIL FRAUD AND THAT THE SUBJECT CELL PHONE CONTAINS EVIDENCE RELATED TO THOSE CRIMES**

39.    On June 15, 2018, I received records from Verizon Wireless in response to a federal court order authorized by Judge Mix.   The records showed Clabaugh is the subscriber of the SUBJECT CELL PHONE, having a home address of the SUBJECT RESIDENCE.

40.    I have obtained copies of Denver Police Department reports related to a traffic accident that occurred in Denver on December 22, 2017.   The report identifies DENG as one of the parties involved in the accident.   It also relays that DENG identified her phone number as 720-822-4667, the number associated with the SUBJECT CELL PHONE.

41.     I submit Clabaugh and DENG have a personal relationship.  I have found in my experience it is not unusual for cellular telephones to be subscribed to in the name of one person, but for the telephone to be primarily used by that individual's family or friends.

42.     As set forth in DENG's aforementioned purchases and attempted purchases of gift cards at Walmart on February 15, 2018 and Best Buy on February 22, 2018, evidence gathered in this case shows that DENG uses a cellular telephone to further the scheme. On April 12, 2018, Detective Deichert provided me with records Detective Deichert obtained from Verizon Wireless via a Colorado state court order.  Among other things, the records contained internet protocol log information for DENG's use of the SUBJECT CELL PHONE during TPD's surveillance operation on February 15, 2018.  FBI Computer Scientist Brian Turner's analysis of the log showed the SUBJECT CELL PHONE accessed an internet protocol address associated with an internet-based business known as giftme.cards.  I have reviewed the "about us" section of giftme.cards' website.  The section contains the following statement: "discounted cards delivered instantly to your smartphone."

## STATEMENTS OF PROBABLE CAUSE

43.     I submit there is probable cause to believe DENG is laundering the proceeds of a wire fraud scheme via the redemption of ill-gotten gift cards and subsequent purchase of other gift cards.

44.     I submit there is probable cause to believe the SUBJECT RESIDENCE, described in ATTACHMENT A, contains evidence, fruits and instrumentalities of the SUBJECT OFFENSES, as described in ATTACHMENT B.

45.     I submit there is probable cause to believe the SUBJECT CELL PHONE, described in ATTACHMENT C, contains evidence, fruits and instrumentalities of the SUBJECT OFFENSES, as described in ATTACHMENT D.

46.     I submit there is probable cause to believe the SUBJECT CELL PHONE, described in ATTACHMENT A, is an instrumentality of the aforementioned crimes.

## AUTHORIZATION REQUESTS

47.     Based on the foregoing, I request that the Court issue the proposed warrants authorizing the search of the SUBJECT RESIDENCE, described in ATTACHMENT A, the seizure of the items described in ATTACHMENT B (including the SUBJECT CELL PHONE); the search of the SUBJECT CELL PHONE, described in ATTACHMENT C, and the seizure of the items described in ATTACHMENT D.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully Submitted,

s/ Justin Stern_____
Justin Stern
Special Agent
Federal Bureau of Investigation

Sworn to before me this 2nd day of July 2018.

HON. MICHAEL E. HEGARTY
UNITED STATES MAGISTRATE JUDGE

**Reviewed and submitted by Bryan David Fields, Assistant United States Attorney.**

26